997 A.2d 392 (2010)
The HOSPITAL & HEALTHSYSTEM ASSOCIATION OF PENNSYLVANIA, Geisinger Health System, St. Vincent Health Center and Abington Memorial Hospital, Petitioners
v.
The COMMONWEALTH of Pennsylvania, the Department of Insurance, The Treasury Department, and the Office of the Budget of the Commonwealth of Pennsylvania, Respondents.
The Pennsylvania Medical Society, on behalf of itself and all of its Members, Petitioners
v.
The Commonwealth of Pennsylvania; The Department of Insurance, The Treasury Department, and The Office of the Budget of the Commonwealth of Pennsylvania, Respondents.
No. 522 M.D. 2009, No. 523 M.D. 2009
Commonwealth Court of Pennsylvania.
Argued February 10, 2010.
Decided April 15, 2010.
*394 Kevin J. McKeon, Harrisburg and David E. Loder, Philadelphia, for petitioners.
Daniel Segal and Dylan J. Steinberg, Philadelphia, for respondents.
BEFORE: PELLEGRINI, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, McCULLOUGH, Judge, and BUTLER, Judge.
OPINION BY Judge BUTLER.
The Hospital & Healthsystem Association of Pennsylvania, Geisinger Health System, St. Vincent Health Center, Abington Memorial Hospital, and the Pennsylvania Medical Society, on behalf of itself and all of its members (Petitioners) filed an application for summary relief. The Pennsylvania Osteopathic Medical Association (POMA) filed a brief as amicus curiae in support of Petitioners' application. For the reasons that follow, we grant Petitioners' application for summary relief.
This case arises from a dispute over funds appropriated pursuant to the Medical Care Availability and Reduction of Error (MCARE) Act.[1] Under the MCARE Act, health care providers are, with certain exceptions, required to maintain minimum medical professional liability coverage. The MCARE Act establishes a medical professional liability fund commonly known as the MCARE Fund. The MCARE Fund is used to pay claims against providers for losses or damages awarded in medical professional liability actions in excess of their basic insurance coverage. The MCARE Fund is unlike an insurance carrier, in that there is no risk transfer in exchange for "premiums," and the MCARE Fund does not maintain reserves for reported but unresolved claims, or claims incurred but not yet reported. Instead, it operates on a pay-as-it-goes basis. It is undisputed, therefore, that at any point in time, there may be unfunded liability arising from unreported and unresolved claims.
The MCARE Fund is funded by an "assessment" on each participating health care provider, in such a manner as to have funds available to cover claims and expenses for the assessment year.[2] The amount of each "assessment" is determined by the provider's prior claim history and private medical malpractice insurance *395 premiums. In order to be licensed to practice in Pennsylvania, health care providers must maintain both private professional liability insurance and contribute to the MCARE Fund.
In 2003, the General Assembly enacted the Health Care Provider Retention (HCPR) Program[3] (Abatement Law) to alleviate the threat that many physicians would leave Pennsylvania if the exorbitant cost of professional liability insurance was not addressed. The Abatement Law provided abatements to physicians and other participating MCARE providers (excluding hospitals) to reduce MCARE providers' annual MCARE assessments. The abatements were intended to recruit physicians and to provide incentive for physicians to stay in Pennsylvania. The Abatement Law provided eligible physicians in high risk practices 100% abatement of their annual assessment, and other eligible health care providers 50% of their annual MCARE assessment. When originally enacted, the Abatement Law was limited to the 2003-2004 MCARE assessments. Subsequent legislation, however, extended the abatement program to the 2005, 2006, and 2007 MCARE assessments.[4] Sections 711(d)(3)-(4), 712(c)(2)(ii)-(iii), and 745 of the MCARE Act[5] contemplated that the MCARE Fund's coverage would be phased out and replaced with primary coverage. When that occurred, pursuant to Section 712(k) of the MCARE Act,[6] any surplus funds were to be returned to the participating health care providers. It is undisputed that, as of December 31, 2008, the MCARE Fund balance was $104,351,436.72.
On October 9, 2009, Pennsylvania's Governor signed Act No. 2009-50 (Act 50) in an effort to resolve the ongoing budget crisis in the Commonwealth. Section 5 of Act 50 added Section 1717.1-K of the Fiscal Code.[7] Section 1717.1-K(1) of the Fiscal Code authorized the transfer of $100 million from the MCARE Fund to the General Fund.
On October 13, 2009, Petitioners filed petitions for review in the nature of complaints for declaratory judgment and injunctive relief in this Court's original jurisdiction seeking a declaration that the transfer by the Department of Public Welfare (DPW) and the Office of the Budget (Budget) of the Commonwealth of Pennsylvania (collectively, the Commonwealth) of $100 million from the MCARE Fund to the General Fund was unlawful, and requesting an order preventing the transfer, or requiring the Commonwealth to restore those monies to the MCARE Fund.[8] On *396 that same date, Petitioners, Hospital & Healthsystem Association, et al., filed an application for special relief in the nature of a preliminary injunction to enjoin the transfer of the $100 million pending final resolution of that case, so that the monies would be available to satisfy any judgment entered by the Court. (522 M.D.2009). The application was denied by this Court on October 19, 2009, on the basis that Petitioners' concerns were speculative, and failed to demonstrate that the public interest would not be harmed by issuance of the preliminary injunction. A hearing scheduled on the application was cancelled when Petitioners withdrew their application based upon this Court's representations that, if it is determined that the Commonwealth owes the money, it will be paid. On or about October 30, 2009, the Treasury Department effectuated the transfer of the $100 million from the MCARE Fund to the General Fund. On November 12, 2009, Petitioners filed this application for summary relief.
In ruling on an application for summary relief we must "view the evidence of record in the light most favorable to the non-moving party and enter judgment only if there are no genuine issues as to any material facts and the right to judgment is clear as a matter of law." McSpadden v. Dep't of Corrs., 886 A.2d 321, 325 (Pa. Cmwlth.2005). "The moving party has the burden of proving that there is no genuine issue of material fact." Bigansky v. Thomas Jefferson Univ. Hosp., 442 Pa.Super. 69, 658 A.2d 423, 425 (1995). "A material fact is one that directly affects the outcome of the case." Kuney v. Benjamin Franklin Clinic, 751 A.2d 662, 664 (Pa.Super.2000) (citing Stevens Painton Corp. v. First State Ins. Co., 746 A.2d 649, 653 (Pa.Super.2000)).
The Commonwealth claims that there are numerous additional material facts in dispute in this litigation, and there is discovery yet to be conducted. In particular, the Commonwealth provides several witnesses' declarations in an attempt to show, inter alia: Petitioners' involvement in the budget negotiation process; the critical role the challenged transfer played in the budget compromise; the Fund's unbroken record of paying all claims and expenses; the Fund's continued ability to pay all claims and expenses notwithstanding the challenged transfer; the relationship between assessments and similar coverage in the open market; and the lack of effect of the challenged transfer on the assessments paid by participating providers.[9] However, *397 those facts and others cited by the Commonwealth do not appear to directly affect the outcome of this case.
The question of whether the transfer of the $100 million from the MCARE Fund to the General Fund was lawful is a pure question of law. Further, because this case involves a pure question of law, the fact that the Commonwealth wishes to provide additional facts, or to proceed with discovery is not a basis on which this Court should deny summary relief. See Meier v. Maleski, 670 A.2d 755 (Pa. Cmwlth.1996), aff'd, 549 Pa. 171, 700 A.2d 1262 (1997). We hold, therefore, that there are no genuine issues of material fact.
Petitioners further argue that based on the record, they are entitled to judgment as a matter of law. The Commonwealth asserts that Petitioners have no clear right to relief on the bases that: Petitioners lack standing to bring this action, so injunctive relief is not available to them under Pennsylvania law; that Petitioners have no vested legal right to the money in the MCARE Fund since Section 712(a) of the MCARE Act created no vested right, providers received professional liability coverage as fair value exchange for their assessments, a substantial portion of the funds transferred came from the taxpayers, and the transfer did not impair any vested right to a cause of action; and the MCARE assessments do not represent a nonuniform tax in violation of the Constitution, but rather should be analyzed as license fees.
The Commonwealth incorrectly argues that Petitioners do not have standing to bring this action. This Court has held:
It is well settled that an association, as a representative of its members, may have standing to bring a cause of action even in the absence of injury to itself. In order to have standing, the association must allege that at least one of its members is suffering immediate or threatened injury as a result of the challenged action. Moreover, the member of that association who is threatened with injury must have an interest in the litigation that is substantial, direct and immediate.... [A]n interest is `substantial' when there is a discernable adverse effect to an interest of the aggrieved individual which differs from the abstract interest of the general citizenry in having others comply with the law. An interest is `direct' when an aggrieved person can show a causal connection between the alleged harm to his or her interest and the matter of which he or she complains. Finally, the interest is `immediate' when the causal connection *398 between the injury and the matter complained of is not too remote.
Pennsylvania Sch. Bds. Ass'n, Inc. v. Commonwealth Ass'n of Sch. Adm'rs, Teamsters Local 502, 696 A.2d 859, 868-69 (Pa.Cmwlth.1997) (citations omitted). Petitioners here consist of two trade associations who filed their actions on behalf of themselves and their members, plus three individual health care providers. PA Med. Society Pet. for Rev., ¶¶ 1, 3; Hospital & Healthsystem Association of PA, et al, Pet. for Rev., ¶¶ 1-6. These Petitioners have specifically averred that they and their members have suffered harm in that they paid their mandatory assessments, which were to be abated, but the MCARE Fund was underfunded by the Commonwealth and the subject transfer diverted those funds from their intended purpose, rather than being refunded to the participating providers. PA Med. Society Pet. for Rev., ¶¶ 1, 3, 11-16, 24-25, 27, 29; Hospital & Healthsystem Association of PA et al, Pet. for Rev., ¶¶ 1-6, 15-16, 24-28, 33. It is clear that the interest alleged to have adversely affected these medical care providers differs from that of the general citizenry. In addition, there appears to be a causal connection between the transfer by the Commonwealth of $100 million out of the MCARE Fund and the harm claimed to have been suffered by these individuals. Finally, the causal connection between the Commonwealth's transfer of those funds is not too remote for purposes of standing. Therefore, Petitioners' interests, which were allegedly harmed as a result of the Commonwealth's transfer of $100 million out of the MCARE Fund is sufficiently substantial, direct and immediate to warrant the conclusion that Petitioners have standing.
The Commonwealth further incorrectly asserts that Petitioners have no vested legal right to the money in the MCARE Fund. The law is well settled that, in the absence of a constitutional bar, the General Assembly is free to repeal and amend previous legislation. City of Phila. v. Schweiker, 817 A.2d 1217 (Pa.Cmwlth. 2003), aff'd, 579 Pa. 591, 858 A.2d 75 (2004). Section 1976(a) of the Statutory Construction Act of 1972[10] specifically provides, however, that:
(a) The repeal of any civil provisions of a statute shall not affect or impair any act done, or right existing or accrued, or affect any civil action pending to enforce any right under the authority of the statute repealed. Such action may be proceeded with and concluded under the statutes in existence when such action was instituted, notwithstanding the repeal of such statutes, or such action may be proceeded with and concluded under the provisions of the new statute, if any, enacted.
This principle is in line with Article 1, Section 11 of the Pennsylvania Constitution,[11] which provides:
All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as Legislature may by law direct.
Accordingly, "vested rights" are specifically protected from being extinguished by subsequent legislation. Krenzelak v. Krenzelak, 503 Pa. 373, 469 A.2d 987 (1983).
*399 A vested right is "[a] right that so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent." Black's Law Dictionary 1438 (9th ed. 2009); In the Interest of K.A.P., Jr., 916 A.2d 1152 (Pa.Super.2007), aff'd, 596 Pa. 351, 943 A.2d 262 (2008). Rights are only vested when they are fixed and without condition. Sher v. Berks County Bd. of Assessment Appeals, 940 A.2d 629 (Pa. Cmwlth.2008). Moreover, they "must be something more than a mere expectation, based upon an anticipated continuance of existing law. It must have become a title, legal or equitable, to the present or future enforcement of a demand, or a legal exemption from a demand made by another." Konidaris v. Portnoff Law Assocs., Ltd., 598 Pa. 55, 74, 953 A.2d 1231, 1242 (2008) (citing Lewis v. Pennsylvania R. Co., 220 Pa. 317, 324, 69 A. 821, 823 (1908)).
Accrued causes of action constitute vested rights. Ieropoli v. AC & S Corp., 577 Pa. 138, 842 A.2d 919 (2004). Moreover, "[f]or purposes of Article 1, Section 11 ... it is enough to say that the moment a cognizable legal injury is befallen a potential plaintiff, whatever that injury may be, a cause of action has `accrued' and cannot be subsequently eliminated or altered by retroactive act of the legislature." Konidaris, 598 Pa. at 66, 953 A.2d at 1237.
There is no question here that Petitioners have vested rights in the monies transferred by the Commonwealth out of the MCARE Fund as a result of the addition of Section 1717.1-K of the Fiscal Code. Under Section 711(d) of the MCARE Act,[12] health care providers are, with certain exceptions, required to maintain minimum medical professional liability coverage per claim. Section 712(a) of the MCARE Act[13] states:
There is hereby established within the State Treasury a special fund to be known as the [MCARE] Fund. Money in the fund shall be used to pay claims against participating health care providers for losses or damages awarded in medical professional liability actions against them in excess of the basic insurance coverage required by section 711(d), liabilities transferred in accordance with subsection (b) and for the administration of the fund.
Also, under Section 712(d) of the MCARE Act,[14] health care providers are required to pay assessments to fund the MCARE Fund, based upon the prevailing primary premium for each participating health care provider. Thus, in order to practice in Pennsylvania, health care providers are required to maintain private professional liability insurance and contribute to the MCARE Fund.
It is undisputed that, between 2002 and 2008, health care providers have paid nearly $1.5 billion in assessments to the MCARE Fund for its administration, and for the medical professional liability coverage that this "special fund" was created to offer.[15] Petitioners' Br. at 7, n.12; Comm. *400 Br. at 25. Payments were also required to be made to the MCARE Fund by the Commonwealth from the HCPR Account between 2003 and 2007 (some of which was gleaned from the cigarette tax), and from motor vehicle violation surcharges for this purpose. See 40 P.S. §§ 1303.712(m), 1303.1112(c)[16]; 72 P.S. § 8211[17]; 75 Pa. C.S. § 6506. According to the record, $330 million was paid from the HCPR Account up to 2005, and $215-218 million was paid from motor vehicle violation surcharges through 2008. Stip. of Facts, filed October 15, 2009, ¶ 9; Petitioners' Br. at 8, Ex. A; Comm. Br. at 25.
Act 50 did not change the purpose of the MCARE Act's assessments, either prospectively or retrospectively; it merely diverted $100 million in funds therefrom, and repealed the section that funded the MCARE Fund with monies from the HCPR Account (and Section 6506 of the Vehicle Code[18]). The purpose of the MCARE Fund, and its manner of obtaining assessments from physicians, remained the same. Petitioners' Br. at 16; POMA Br. at 7; Comm. Br. at 34. While participating health care providers may have received coverage in exchange for their assessments up to the time of the $100 million transfer, the depletion of the MCARE Fund leaves participating providers with a deficit they must make up in the event that claims must be paid thereafter. Such an abrupt depletion of the MCARE Fund is contrary to the legislated plan for the transition to a fully-private system. See 40 P.S. §§ 711(d)(3)-(4), 712(c)(2)(ii)-(iii), 745. Lastly, Section 712(k) of the MCARE Act provides that, "[u]pon satisfaction of all liabilities of the fund, the fund shall terminate [and, a]ny balance remaining in the fund upon such termination shall be returned by the department to the participating health care providers who participated in the fund in proportion to their assessments in the preceding calendar year."
Citing Commonwealth ex rel. Fortney v. Bartol, 342 Pa. 172, 20 A.2d 313 (1941), the Commonwealth argues that budgetary appropriations do not create vested rights in any fund; rather, they are executory gifts subject to revocation before the monies are actually paid. That case is clearly distinguishable from the present action in that, unlike here, it is based upon a municipal ordinance that required an appropriation from a general, rather than special, fund which was based upon an unenforceable contractual agreement, rather than law.
It is clear that, particularly under Sections 712(a) and (k), the MCARE Act rises to the level of a guarantee that, for the life of liabilities of the MCARE Fund, it was to be used solely for MCARE-related purposes, or the money was to be returned to the contributing health care providers in a proportionate fashion, without regard to any fair exchange value they may have received in the form of professional liability coverage, without regard to what percentage of the MCARE Fund may have been contributed by the taxpayers by virtue of the HCPR Account and motor vehicle violation surcharges, and without any statutory provision that the funds be returned to the Commonwealth.[19] Thus, Petitioners' *401 rights to the $100 million transferred by the Commonwealth out of the MCARE Fund are more than mere expectations, and rise to the level of an accrued action, based upon legal or equitable title, subject to the present or future enforcement of a demand. They are, therefore, vested rights that cannot be extinguished by the addition of Section 1717.1-K of the Fiscal Code.
This Court addressed the issue of the Commonwealth's failure to fund abatements in its July 24, 2009 memorandum opinion addressing the Commonwealth's preliminary objections filed in the related action (584, 585 M.D. 2008). Since the reasoning and analysis in that opinion addressed the precise issue before us now, we restate it as highly instructive here. In that opinion, this Court stated:
Contrary to Respondents' position, the end of the HCPR Program only means that the Insurance Department will no longer grant abatements to eligible health care providers. It does not mean that DPW and Budget Secretary may avoid their statutory responsibilities to fund the program from the specifically designated HCPR Account while the program was in effect. If indeed it is determined that the funds were inappropriately withheld, then it is entirely proper and consistent with the Abatement Law to direct the Respondents to transfer the appropriated funds to the MCARE Fund.
The Pennsylvania Med. Soc'y v. Dep't of Pub. Welfare (Pa.Cmwlth. Nos. 584, 585 M.D.2008, filed July 24, 2009) (The Pennsylvania Med. Soc'y), slip op. at 15 (citation omitted). The same reasoning is applicable here. The Commonwealth's concern that a decision in this case in Petitioners' favor may imperil the budget process is, therefore, without merit. The Commonwealth's arguments do not change the fact that this Court is required to administer justice in interpreting and applying the laws enacted by the General Assembly with respect to all matters brought before the Court for adjudication. Indeed, our system of government is designed to be one of checks and balances such that justice is ultimately the end result.
Finally, the Commonwealth correctly argues that the MCARE assessments do not represent a non-uniform tax in violation of the Constitution, but rather should be analyzed as license fees. Again, in its July 24, 2009 opinion as to the Commonwealth's preliminary objections filed in the related action (584, 585 M.D. 2008) addressing this very issue, this Court explained:
The Uniformity Clause provides, in relevant part: `All taxes shall be uniform, upon the same classes of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws.' Taxes must be applied with uniformity upon similar kinds of businesses or property and with substantial equality of the tax burden upon all members of the same class. A taxpayer who alleges a violation of the Uniformity Clause must show either that there is a deliberate discrimination in the application of the tax or that the tax has a discriminatory effect. The purpose of requiring all tax laws to be uniform is to produce equality of taxation.
. . . .
Taxes are `burdens or charges imposed by the legislative power upon persons or property to raise money for *402 public purposes, and to defray the necessary expenses of government.' The distinguishing feature of a tax is that it is imposed to raise revenue.
The Abatement Law is not a tax statute, and the Uniformity Clause, therefore, does not apply because no tax is involved. There is nothing in the Abatement Law that indicates that its purpose is other than to alleviate the cost of medical professional liability insurance. It does not directly or indirectly impose any tax on Petitioners.
This Court held in White v. Commonwealth[] Med. Prof'l Liab. Catastrophic [Catastrophe Loss] Fund, 57[1] A.2d 9 (Pa.Cmwlth.1990), that monies paid by providers into a Commonwealth professional medical malpractice insurance fund were not taxes.
There, the Court considered whether the surcharge imposed under Section 701(e)(1) the former Health Care Services Malpractice Act, predecessor to the MCARE Act, was a tax. In determining the purpose of the surcharge, the Court pointed to specific language which provided that all funds raised by the surcharge would be held in trust, deposited in a segregated account, invested and reinvested, and not become a part of the General Fund of the Commonwealth. Rejecting the providers' argument in that case, this Court also noted that the Medical Professional Liability Catastrophic Fund (CAT Fund) created by the Malpractice Act regulated physician practices because it `demand[ed] participation and contribution to the program designed ... to alleviate a shortage of available medical malpractice coverage in Pennsylvania.['] The Court pointed out that the CAT Fund actually paid claims to patients on behalf of physicians. The Court concluded that the surcharge imposed by the Malpractice Act was a license fee, not a tax, and the Uniformity Clause did not apply.
This Court discerns no difference between the surcharges in the White case and the abatements involved in this controversy. And, even if the burden to pay the abatements was shifted to Petitioners, it would not `convert' those abatements into a tax. Again, the abatements were intended to provide assistance to providers by reducing their MCARE Fund assessments. Like the surcharges which were used to fund the CAT Fund in White, the specific purpose of the abatements is to provide revenue to the MCARE Fund to reduce the high costs of insurance premiums, not to raise revenue for the Commonwealth. The abatements are placed in a `special fund' with the Treasury and not into the General Fund. The Commonwealth does not realize any income accrued by the interest on the MCARE Fund and all claims and expenses paid are deemed to be against the Fund itself, not the Commonwealth.
Accordingly, this Court must agree with Respondents that the abatements are not taxes. ...
The Pennsylvania Med. Soc'y, slip op. at 16-19 (citations and footnote omitted).
Based upon the reasoning of this Court in the related case, particularly in light of the references to the White case, which involved the MCARE Act's predecessor, the MCARE Act assessments are not to be deemed taxes, so Petitioners' arguments on this point must fail. Moreover, deeming the assessments paid by participating health care providers "license fees," further supports an interpretation by this Court that they belong to the providers and not generally to the Commonwealth.
POMA additionally argues in support of Petitioners that, even if the Commonwealth had the power to make the subject *403 transfer of funds, Section 1717.1-K(1) of the Fiscal Code referenced more than one subject, in violation of Article III, Section 3 of the Pennsylvania Constitution (Article III, Section 3), and effectively amended the MCARE Act by reference only to its title, in violation of Article III, Section 6 the Pennsylvania Constitution (Article III, Section 6). Article III, Section 3 provides that, "[n]o bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof."[20] Article III, Section 6 states that "[n]o law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only, but so much thereof as is revived, amended, extended or conferred shall be re-enacted and published at length."[21] "The purpose of th[ese] provision[s] ... is to provide full notice of all legislative enactments and prevent the passage of sneak legislation." Christ the King Manor v. Dep't of Pub. Welfare, 911 A.2d 624, 638 (Pa.Cmwlth. 2006) (citing L.J.W. Realty Corp. v. City of Phila., 390 Pa. 197, 134 A.2d 878 (1957)).[22] As this Court has determined that the Commonwealth unlawfully transferred $100 million from the MCARE Fund to the General Fund, the question of whether Act 50 constituted "stealth" legislation is moot. Moreover, since it appears that Petitioners have followed closely, and even lobbied their cause during the 2009 budget legislation process, it can hardly be said that either they or their legislators were unaware of the intention of Act 50 to transfer the subject funds. Thus, POMA's argument on this issue is unpersuasive.
Viewing the record in a light most favorable to the Commonwealth, it is clear that Petitioners are entitled to judgment in their favor as a matter of law. The Petitioners have established that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. The application for summary relief is, therefore, granted.
President Judge LEADBETTER and Judge BROBSON did not participate in the decision in this case.

ORDER
AND NOW, this 15th day of April, 2010, Petitioners' application for summary relief is granted.
DISSENTING OPINION BY Judge PELLEGRINI.
For reasons set forth in my dissenting opinion in The Pennsylvania Medical Society, et al v. The Department of Public Welfare of the Commonwealth of Pennsylvania, et al., 994 A.2d 33 (Pa.Cmwlth. 2010), I respectfully dissent.
NOTES
[1] Act of March 20, 2002, P.L. 154, as amended, 40 P.S. §§ 1303.101-1303.1115.
[2] In its brief, POMA describes the process as follows:

The statutory formula [40 P.S. § 1303.712(d)] is used to determine how much additional funding MCARE will need in a given year for its statutory purpose. Thus, if MCARE needs $200 million to satisfy those obligations, but has a $100 million surplus, MCARE needs to raise only $100 million from assessments, not $200 million, to meet its obligations.
POMA Br. at 8.
[3] Originally enacted as Act of December 23, 2003, P.L. 237, formerly 62 P.S. §§ 443.7 and 1301-A1310-A, repealed and reenacted as an amendment to the MCARE Act by the Act of December 22, 2005, P.L. 458, 40 P.S. §§ 1303.1101-1115. Citations herein are made to the provisions of the Abatement Law as reenacted in the MCARE Act, subsequently repealed by Act of October 9, 2009, P.L. 537.
[4] Section 4 of the Act of November 29, 2004, P.L. 1272, formerly 62 P.S. § 1301-A and 1302-A (extending program to 2005); Section 2 of the Act of December 22, 2005, P.L. 458, formerly 40 P.S. § 1303.1102 (extending program to 2006); Section 2 of the Act of October 27, 2006, P.L. 1198, 40 P.S. § 1303.1102 (extending program to 2007).
[5] 40 P.S. §§ 1303.711(d)(3)-(4), 1303.712(c)(2)(ii)-(iii), 1303.745.
[6] 40 P.S. § 1303.712(k).
[7] Act of April 9, 1929, P.L. 343, added by Act of Oct. 9, 2009, P.L. 537, 72 P.S. § 1717.1-K.
[8] Separate petitions were filed by the Hospital & Healthsystem Association of Pennsylvania, Geisinger Health System, St. Vincent Health Center and Abington Memorial Hospital at 522 M.D.2009, and the Pennsylvania Medical Society, on behalf of itself and all of its Members at 523 M.D.2009. On November 6, 2009, these cases were consolidated.
[9] The Commonwealth argues that transfers from the HCPR Account to the MCARE Fund were not necessary after 2005 and that, since 2002, the MCARE Fund has been "able to fulfill its current obligations to pay claims and expenses" without further transfers from the HCPR Account, and that it can cover its current obligations even after the $100 million is transferred to the General Fund. Comm. Br. at 36, citing Adams Decl. ¶¶ 5, 12. There is no dispute that the MCARE Fund has always had the ability to pay its bills. The question before us, however, is not whether it can pay current claims, but whether the transfer of the $100 million was lawful. Since the future obligations of the MCARE Fund are in jeopardy due to the transfer of the $100 million, we will address that issue here.

The MCARE Fund consists of monies from the Medical Professional Liability Catastrophe Loss Fund (CAT Fund) (40 P.S. § 1303.712(b)); provider assessments (40 P.S. §§ 1303.712(d), 1303.712(l)); abatements funded by taxpayers in the form of motor vehicle violation surcharges and monies in the HCPR Account from cigarette taxes (40 P.S. §§ 1303.712(m), 1303.1112(c); Act of March 4, 1971, P.L. 6, as amended, 72 P.S. § 8211, added by the Act of December 23, 2003, P.L. 250; and, 75 Pa.C.S. § 6506); and investments (40 P.S. § 1303.712(l)). The monies in the MCARE Fund must be used to pay claims against medical care providers for damages awarded in medical professional liability cases in excess of their basic insurance coverage (and CAT Fund cases), and costs of administration of the MCARE Fund (40 P.S. § 1303.712(a)). The MCARE Fund is managed on a "pay-as-you-go" basis. It does not collect and maintain reserves, so the annual assessment merely collects funds needed to cover claims and expenses for the assessment year. However, claims are being made on an ongoing basis that must be paid into the future by the MCARE Fund until it has satisfied all of its liabilities. Thus, the MCARE Fund has unfunded liabilities. It must project what monies will be necessary to pay for claims reported but not yet paid, and for those incurred but not yet reported. Since the abatements were not fully funded between 2003 and 2007, the MCARE Fund has less money available to meet its future obligations and must, under the current statutory scheme, over time, increase provider assessments in order to meet them. Disbursement of the $100 million from the MCARE Fund makes that problem worse. Providers in the future, therefore, will pay increased assessments, meaning that any abatements they have received were actually only mere payment deferrals, rather than abatements. When the MCARE Fund has satisfied all of its liabilities, it will terminate (40 P.S. § 1303.712(k)). It has been statutorily mandated that monies remaining in the fund at that time, if any, will then be returned to providers (40 P.S. § 1303.712(k)).
[10] 1 Pa.C.S. § 1976(a).
[11] Pa. Const. art. I, § 11.
[12] 40 P.S. § 1303.711(d).
[13] 40 P.S. § 1303.712(a).
[14] 40 P.S. § 1303.712(d).
[15] Specifically, Section 712(d) of the MCARE Act requires that the physicians' assessments be sufficient to:

(i) Reimburse the fund for the payment of reported claims which became final during the preceding claims period.
(ii) Pay expenses of the fund incurred during the preceding claims period.
(iii) Pay principal and interest on moneys transferred into the fund in accordance with section 713(c).
(iv) Provide a reserve that shall be 10% of the sum of subparagraphs (i), (ii) and (iii).
[16] Section 1112(c) of the MCARE Act.
[17] Section 1211 of the Act of March 4, 1971, P.L. 6, as amended, added by Section 19.1 of the Act of Dec. 23, 2003, P.L. 250.
[18] 75 Pa.C.S. §§ 101-9805.
[19] The latter fact was acknowledged by this Court, en banc, in its July 24, 2009 opinion as to the Commonwealth's preliminary objections filed in the related action (584, 585 M.D. 2008), in which the Court stated that HCPR abatements "were intended to provide assistance to providers by reducing their MCARE Fund assessments ..., not to raise revenue for the Commonwealth." The Pennsylvania Med. Soc'y v. Dep't of Pub. Welfare (Pa. Cmwlth. Nos. 584, 585 M.D. 2008, filed July 24, 2009), slip op. at 18.
[20] Pa. Const. art. III, § 3.
[21] Pa. Const. art. III, § 6.
[22] In its brief, the Commonwealth states that "neither POMA or Petitioners cite to any case in which a court has struck down an enactment on the basis of Section 6 at all." Comm. Br. at 33 n.30. This representation is incorrect. To the contrary, Petitioners specifically cited in their brief Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth, 583 Pa. 275, 323-24, 877 A.2d 383, 412 (2005), in which the Pennsylvania Supreme Court declared invalid a repealer of Section 493(29) of the Liquor Code (Act of April 12, 1951, P.L. 90, as amended, 47 P.S. §§ 1-101  10-1001) as violative of Article III, Section 6 of the Pennsylvania Constitution. Petitioners' Br. at 16 n.17.